**DEAN WITTER REYNOLDS, INC.,**
**a Delaware Corporation,**
**Plaintiff-Appellant,**

v.

**Karen HOWSAM, individually, and as Trustee for the E. Richard Howsam, Jr., Irrevocable Life Insurance Trust dated May 14, 1982, Defendant-Appellee.**

No. 99-1320.

United States Court of Appeals,
Tenth Circuit.

Aug. 9, 2001.

Bradford D. Kaufman, Greenberg Traurig, P.A. (Joseph C. Coates, Greenberg Traurig, PA, and Martin D. Litt, Holme Roberts & Owen LLP, with him on the briefs), West Palm Beach, FL, for Plaintiff-Appellant.

Alan C. Friedberg, Pendleton, Friedberg, Wilson & Hennessey, P.C., Denver, CO, for Defendant-Appellee.

Before EBEL and LUCERO, Circuit Judges, and VRATIL,* District Judge.

EBEL, Circuit Judge.

Plaintiff-Appellant Dean Witter Reynolds, Inc. brought this action seeking to enjoin Respondent Appellee Karen How-

* The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

sam from arbitrating a dispute between Dean Witter and Howsam with the National Association of Securities Dealers ("NASD") on the ground that the dispute was time-barred under NASD rules. The district court concluded that the parties, in a 1992 ACCESS Client Service Agreement, had "clearly and unmistakably" agreed that all disputes between the parties, including questions regarding the arbitrability of those disputes, would be determined by an arbitrator rather than by the courts. The district court thus dismissed Dean Witter's cause of action. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude that the district court erred in finding that the parties "clearly and unmistakably" agreed to allow an arbitrator, rather than the courts, to decide whether specific disputes are arbitrable. We therefore REVERSE the decision of the district court and REMAND for further proceedings.

## BACKGROUND

Karen Howsam ("Howsam") was a customer of Dean Witter Reynolds, Inc. ("Dean Witter") in March and April 1986, at which time she was advised by Dean Witter, through two of its brokers, Robert P. Howard and Paul J. Siler, to invest in a total of four limited partnerships. Howsam remained invested in those limited partnerships, allegedly due to the ongoing advice of Dean Witter, until late 1994, at which point she closed her Dean Witter accounts and moved her funds to another investment firm.

During the period when Howsam was a customer of Dean Witter, Howsam entered into a standard ACCESS Client Service Agreement ("1992 ACCESS Agreement"). The 1992 ACCESS Agreement, which was drafted by Dean Witter and signed by both Howsam and a Dean Witter representative, stated:

> The Client agrees that all controversies between the Client and Dean Witter and/or any of its officers, directors, or employees, present or former, concerning or arising from (i) any account maintained with Dean Witter by Client; (ii) any transaction involving Dean Witter and Client, whether or not such transaction occurred in such account or accounts; or (iii) the construction, performance or breach of this or any other agreement between us, whether such controversy arose prior to, on or subsequent to the date hereof, shall be determined by arbitration before any self-regulatory organization or exchange of which Dean Witter is a member. The Client may elect which of these arbitration forums shall hear the matter. . . .

Additionally, the 1992 ACCESS Agreement contained a provision specifying that the Agreement would be construed and enforced in accordance with New York state law "without reference to choice of law doctrine."

Pursuant to the terms of the 1992 ACCESS Agreement, on March 7, 1997, Howsam commenced an arbitration proceeding before the NASD regarding Dean Witter's recommendation that she invest in the four limited partnerships. Howsam filed an amended arbitration claim on April 10, 1997. In the amended claim, Howsam alleged that Dean Witter, through its agents Howard and Siler, made material misrepresentations about the investments prior to her decision to purchase them, and that the investments were unsuitable for someone with her investment needs. Howsam further alleged that Dean Witter, again through its agents, continued to inform her that the investments were sound, despite indications to the contrary, which impeded her understanding of the true nature of the investments until late 1994.

In order to commence the arbitration before the NASD, Howsam executed a Uniform Submission Agreement ("1997

Submission Agreement"), as required by the NASD. The 1997 Submission Agreement stated that Howsam agreed to submit her claims to the NASD with the understanding that the arbitration would be conducted in accordance with the rules and provisions of the NASD. Specifically, the 1997 Submission Agreement stated:

> 1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, . . . to arbitration in accordance with the Constitution, By Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

The 1997 Submission Agreement contained another provision asserting, "The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration." Although only Howsam signed the 1997 Submission Agreement, Dean Witter had effectively agreed to the 1997 Submission Agreement when, in the 1992 ACCESS Agreement, it gave Howsam the power to select the particular arbitration forum that would hear any dispute arising between the parties.

The NASD Code of Arbitration Procedure ("NASD Code") contains a provision stating that "[n]o dispute, claim or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy." *See* NASD Code § 10304 (formerly NASD Code § 15).[1] Based upon this provision in the NASD

Code, Dean Witter (and co-defendant Howard, who was later dismissed from the lawsuit [2]) filed a complaint in the United States District Court for the District of Colorado, requesting declaratory relief in the form of a court determination that Howsam's claims were untimely and thus non-arbitrable by the NASD, as well as an order enjoining the NASD arbitration proceeding pending resolution of Dean Witter's claim. Dean Witter asserted that the question of arbitrability of Howsam's claims was for the court, and not for NASD arbitrators, to decide.

In response, Howsam filed a "Motion to Dismiss for Lack of Jurisdiction" ("Motion"). In the Motion, Howsam argued that the district court lacked jurisdiction to decide the issue of arbitrability because the parties, in the form of the 1992 ACCESS Agreement, had agreed that all issues concerning or arising from Dean Witter's account-related services would be submitted to arbitration. Additionally, Howsam argued that the 1992 ACCESS Agreement's choice of law provision, which specified that New York state law would govern any dispute between the parties, required that NASD arbitrators, and not the district court, determine whether Howsam's claims were arbitrable because a claim's arbitrability under § 10304 of the NASD Code is a question reserved for arbitrators under New York state law.

Dean Witter countered by arguing that, because Howsam had not contested Dean Witter's asserted basis for subject matter jurisdiction (*i.e.*, diversity of citizenship),

---

1. For purposes of clarity, we consistently refer to this provision by its current section number, "NASD Code § 10304," but note that several cases cited in this opinion refer to the provision by its prior section number, "NASD Code § 15."

2. Dean Witter and Howard asserted diversity jurisdiction for purposes of establishing subject matter jurisdiction in the federal courts. Dean Witter was subsequently forced to dismiss Howard from the action in order to maintain complete diversity. The record does not indicate why Paul Siler, the other broker against whom Howsam brought claims in the NASD arbitration, was not a party to Dean Witter's federal lawsuit.

her Motion arguing that the court lacked jurisdiction and that the complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) was effectively a motion to dismiss for failure to state a claim under Rule 12(b)(6). Because the Motion was more properly characterized as a motion to dismiss under Rule 12(b)(6), Dean Witter argued, the district court should not consider the 1992 ACCESS Agreement because it was not attached to or referenced in Dean Witter's complaint. Dean Witter further argued that, even if the court were to look to the 1992 AC-CESS Agreement, it did not provide "clear and unmistakable" evidence that the parties agreed to submit the question of arbitrability to the chosen arbitration organization.

The district court granted Howsam's Motion on June 28, 1999. The district court analyzed the language of the 1992 AC-CESS Agreement (without referencing the 1997 Submission Agreement) and concluded that its language provided "clear and unmistakable" evidence that the parties intended to submit all issues, including the issue of arbitrability, to the chosen arbitration body. *See Dean Witter Reynolds, Inc. v. Howsam,* No. 97-WM-1463, slip op. at 2-4 (D. Colo. June 28, 1999).

On appeal, Dean Witter argues, first, that the district court erred in looking to the 1992 ACCESS Agreement because Howsam's motion was, in effect, a motion to dismiss pursuant to Rule 12(b)(6) and, since Dean Witter never referenced the 1992 ACCESS Agreement in its complaint, the 1992 ACCESS Agreement was not properly before the court. Second, Dean Witter argues that, regardless of whether the 1992 ACCESS Agreement could potentially be reviewed by the court, that agreement was superceded by the 1997 Submission Agreement and thus was no longer the controlling agreement between the parties. Third, Dean Witter asserts that,

even if we find the district court's review of the 1992 ACCESS Agreement appropriate, that agreement does not "clearly and unmistakably" demonstrate that the parties agreed to have the question of arbitrability of any given dispute decided by an arbitrator rather than the courts.

## DISCUSSION

### 1. *Standard of Review*

■ We have stated, "Because it is based on contract interpretation, arbitrability is a legal question ... [that] we review de novo." *Cogswell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 78 F.3d 474, 476 (10th Cir.1996). District court determinations regarding subject matter jurisdiction are reviewed de novo. *See Hart v. Dep't of Labor ex rel. United States,* 116 F.3d 1338, 1339 (10th Cir.1997). Because this appeal arises from a motion to dismiss, we accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the non-moving party. *See Prager v. LaFaver,* 180 F.3d 1185, 1187 n. 1 (10th Cir.1999).

### 2. *Analysis*

a. *The district court properly reviewed the 1992 ACCESS Agreement when deciding Howsam's motion to dismiss*

■ Dean Witter argues that the district court erred in treating Howsam's Motion as a 12(b)(1) motion rather than a Rule 12(b)(6) motion. That distinction is important because the district court looked outside the confines of Dean Witter's complaint, *i.e.,* to the 1992 ACCESS Agreement, when deciding Howsam's Motion, and generally courts should not look beyond the confines of the complaint itself when deciding a Rule 12(b)(6) motion to dismiss. Without deciding whether the dis-

trict court erred in treating Howsam's motion as a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, we hold that even if the district court had treated Howsam's Motion as a Rule 12(b)(6) motion to dismiss for failure to state a claim it still could have properly considered the language of the 1992 ACCESS Agreement. Therefore, any error that may have occurred when the district court characterized Howsam's motion as a Rule 12(b)(1) motion is harmless to this case.

■■■■ It is permissible for a court to look beyond the four corners of the complaint when deciding a Rule 12(b)(1) motion to dismiss, *see Pringle v. United States,* 208 F.3d 1220, 1222 (10th Cir.2000), but it is generally unacceptable for a court to do so when deciding a Rule 12(b)(6) motion to dismiss, *see Jackson v. Integra, Inc.,* 952 F.2d 1260, 1261 (10th Cir.1991) (stating that a court "must examine only the plaintiff's complaint ... [and] cannot review matters outside of the complaint" when deciding a Rule 12(b)(6) motion). If the court on a Rule 12(b)(6) motion looks to matters outside the complaint, the court generally must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *See* Fed. R. Civ. P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in [Federal Rule of Civil Procedure] 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

■■■■ It is debatable whether the district court erred in deciding Howsam's Motion under Rule 12(b)(1) rather than Rule 12(b)(6). We need not resolve that issue in this case, however, because the district court was justified in looking to the 1992 ACCESS Agreement in any event. It is accepted practice that, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers,* 130 F.3d 1381, 1384 (10th Cir.1997); *see also Brooks v. Blue Cross & Blue Shield of Fla.,* 116 F.3d 1364, 1369 (11th Cir.1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, ... the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment.") (citing *Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993)). "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *See GFF,* 130 F.3d at 1385.

■■■■ Dean Witter asserts that it did not reference the 1992 ACCESS Agreement in its complaint. We disagree. In its complaint, Dean Witter stated: "Dean Witter and Defendants are parties to an *arbitration agreement.* Consistent with *that agreement,* Defendants filed their Arbitration with the NASD." The parties have presented only two arbitration agreements in this case: the 1992 ACCESS Agreement and the 1997 Submission Agreement. Thus, the reference by Dean Witter to an "arbitration agreement" must be to the 1992 ACCESS Agreement. The decision to commence arbitration before the NASD was "consistent" only with that agreement, which required Howsam to submit "all controversies" to arbitration by the NASD or another arbitration body of which Dean

Witter was a member. The 1997 Submission Agreement, on the other hand, was part of the submission of Howsam's claims to the NASD and it would make little sense for Dean Witter to allege that the act of submitting the 1997 Submission Agreement was "consistent with" itself. In addition, the 1997 Submission Agreement is referenced by another name in the following paragraph. (*See* Complaint ¶ 9 ("At the time Defendants filed their Original Statement of Claim with the NASD, they *also* signed a *Uniform Submission Agreement* ....") (emphasis added).) We therefore find that Dean Witter did reference the 1992 ACCESS Agreement, albeit minimally, in their initial filing with the district court.

The 1992 ACCESS Agreement was the arbitration agreement pursuant to which Howsam was obligated to submit her claims to binding arbitration by the NASD (or another arbitration association of which Dean Witter was a member), and was therefore clearly central--nigh indispensable--to deciding the parties' claims. Accordingly, Howsam brought the 1992 ACCESS Agreement to the district court's attention by discussing it in, and attaching it to, her motion to dismiss. Dean Witter has never argued that the copy of the 1992 ACCESS Agreement attached to Howsam's Motion was not a true and complete copy of the original arbitration agreement between the parties. Under these circumstances, we think it would have defied common sense for the district court to ignore the 1992 ACCESS Agreement when rendering its decision in this case. *Cf. GFF*, 130 F.3d at 1385.

For the foregoing reasons, we find the district court's review of the 1992 ACCESS Agreement appropriate in this case, regardless of whether Howsam's motion was considered under Rule 12(b)(1) or Rule 12(b)(6).

b. *The 1992 ACCESS Agreement, as supplemented by the 1997 Submission Agreement, is the operative agreement between the parties.*

We are next asked to decide which is the operative arbitration agreement in this case, the 1992 ACCESS Agreement or the 1997 Submission Agreement. We find that the 1992 ACCESS Agreement, as supplemented by the 1997 Submission Agreement, is the controlling arbitration contract between the parties.

Dean Witter has argued that the 1997 Submission Agreement superceded the 1992 ACCESS Agreement, or, in the alternative, that the 1997 Submission Agreement modified the 1992 ACCESS Agreement, and thus that the district court erred in analyzing only the 1992 ACCESS Agreement when deciding Howsam's motion to dismiss. Dean Witter offers no convincing case law, however, to support its proposition that the 1997 Submission Agreement *superceded* the 1992 ACCESS Agreement. Instead, the cases cited by Dean Witter stand for the proposition that contract terms contained in an earlier arbitration agreement may be *supplemented* by later submission agreements signed by the parties. *See, e.g., Executone Info. Sys., Inc. v. Davis,* 26 F.3d 1314, 1323 (5th Cir.1994) ("It is well settled that the arbitrator's jurisdiction is defined by *both* the contract containing the arbitration clause and the submission agreement. If the parties go beyond their promise to arbitrate and actually submit an issue to the arbitrator, we look both to the contract *and* to the scope of the submissions to the arbitrator to determine the arbitrator's authority." (citations omitted) (emphasis added)); *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers' Union Local No. 1,* 611 F.2d 580, 583 (5th Cir.1980) ("Before arbitration can actually proceed, it is nec-

essary for the parties to *supplement* the agreement to arbitrate by defining the issue to be submitted to the arbitrator and by explicitly giving him authority to act." (emphasis added)).

When analyzing the parties' intent regarding the scope of the proposed arbitration, we must therefore look both to the original arbitration agreement, in which the parties have generally agreed to arbitrate issues arising from their association, and to the submission agreement, in which the issues to be arbitrated are precisely defined. This is the case so long as there is no express contradiction between the initial arbitration agreement and the submission agreement. *Cf. United Food and Commercial Workers, Local Union No. 7R v. Safeway Stores*, 889 F.2d 940, 946 (10th Cir.1989) ("Extension of the arbitrator's authority through submissions is only allowed to the extent that the submission does not violate an express provision of the collective bargaining agreement.").

The extent to which an arbitration submission agreement may supplement an earlier, general agreement to arbitrate was implicitly acknowledged in *Cogswell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 78 F.3d 474 (10th Cir.1996). The issue of which agreement controlled, *i.e.*, the earlier arbitration agreement signed by both parties or the later submission agreement signed only by the plaintiff, was not squarely addressed by the *Cogswell* court, presumably because the parties in *Cogswell* "agree[d] [that] their arbitration agreement incorporates the NASD Code, and that the agreement is to be 'construed in accordance with the laws of the State of New York.' " 78 F.3d at 478. Nevertheless, the *Cogswell* court's reliance on the initial arbitration agreement is evidenced by its recognition of the choice of law provision,

which was contained only in the initial arbitration agreement entered into by both parties.[3] *See id.* at 475. Further, the *Cogswell* court's reliance on the subsequently filed submission agreement is evidenced by its statement that the parties' agreement incorporated the NASD Code, which was not referenced in the initial agreement but was specifically identified as the governing "Code of Arbitration" in the arbitration submission agreement signed by the plaintiff. *See id.* The court thus recognized that the earlier arbitration agreement had been supplemented by the submission agreement, at least to the extent that it identified the rules and regulations by which the plaintiff, through her election of the NASD as the arbitral body, agreed to be bound. Accordingly, we read *Cogswell* as recognizing that an arbitration submission agreement may supplement a prior arbitration agreement entered into by the parties, even without evidence that the non-submitting party agreed to the express terms of the submission agreement, when the non-submitting party had earlier given authority to the submitting party to choose an arbitration forum, as well as that forum's rules and regulations, from among a list of approved arbitration organizations.

In this case, Howsam agreed in the 1992 ACCESS Agreement to choose an arbitration forum from a list of approved organizations should she choose to bring a claim against Dean Witter. In filing the 1997 Submission Agreement, Howsam elected to have her claims resolved by the NASD pursuant to NASD rules and regulations. Specifically, in signing the 1997 Submission Agreement, Howsam agreed to "submit the present matter in controversy, as set forth in the attached statement of claim, ... to arbitration in accordance with

---

**3.** It is thus clear that the *Cogswell* court did not view the arbitration submission agreement as having *superceded* the previous

signed arbitration agreement between the parties, as Dean Witter argues in this case.

the Constitution, By Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization." There is no contradiction between the 1992 ACCESS Agreement and the 1997 Submission Agreement, such that the latter can plausibly be seen to supplement the former. *Cf. United Food,* 889 F.2d 940 at 947. We therefore conclude that both the 1992 ACCESS Agreement and the 1997 Submission Agreement apply in this case.

c. *The 1992 ACCESS Agreement, as supplemented by the 1997 Submission Agreement, does not "clearly and unmistakably" demonstrate the parties' intent to have issues of arbitrability decided by an arbitrator rather than by the courts*

1) *Agreement must provide clear and unmistakable evidence of the parties' intent*

The Supreme Court has stated that "arbitration is a matter of contract," and thus that parties should not be forced to arbitrate issues that have not been agreed upon. *See AT & T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (interpreting an arbitration clause contained in a collective bargaining agreement). The Court has further stated that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate [a particular claim] is to be decided by the court, not the arbitrator." *Id.* at 649, 106 S.Ct. 1415 (remanding the case to the district court to decide whether the collective bargaining agreement allowed arbitration of a particular labor dispute).

The Supreme Court explained the applicable standards in *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), where it held that "[j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." 514 U.S. at 943, 115 S.Ct. 1920 (citations omitted). The *First Options* Court also noted, however, the particular difficulty in allowing arbitrators to decide the scope of their own jurisdiction:

[T]he "who (primarily) should decide arbitrability" question ... is rather arcane. A party often might not focus upon that question or upon the significance of having the arbitrators decide the scope of their own powers. And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.

*Id.* at 945, 115 S.Ct. 1920 (citations omitted). Accordingly, the Court imposed a stringent test for the courts to apply in cases where the parties disagree over who should decide the arbitrability issue. Specifically, the Court stated: "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944, 115 S.Ct. 1920 (citing *AT & T,* 475 U.S. at 649, 106 S.Ct. 1415) (alteration in original).

We adopted this standard in *Cogswell,* where we were asked to decide whether the district court or an arbitrator should determine whether an arbitration claim is barred under the time limit contained in NASD Code § 10304. *See* 78 F.3d at 476. The plaintiff in *Cogswell* commenced an arbitration proceeding with the NASD and then filed a motion to compel arbitration in the United States District Court for the

District of Colorado. *See id.* at 475. In ruling on the plaintiff's motion, the district court concluded that the arbitrators, and not courts, should determine whether the limitations period set forth in NASD Code § 10304 bars an arbitration claim. *Id.* at 475-76.

■ On appeal we reversed, noting that courts in other jurisdictions were "sharply divided" on the issue, but that the majority of courts had concluded that courts, and not arbitrators, should determine whether an action is time-barred by the NASD Code because that determination involves the scope of the arbitrator's "subject matter jurisdiction." *See id.* at 476-77. After discussing the holdings of courts reaching a contrary conclusion, as well as the Supreme Court's recent decision in *First Options*, the *Cogswell* court adopted the majority view that the courts, and not arbitrators, should determine the arbitrability under NASD Code § 10304 of disputes submitted to arbitration, absent a "clear and unmistakable" agreement to the contrary. *See id.* at 481; *see also, e.g., Oil, Chemical, & Atomic Workers Int'l Union v. Conoco, Inc.,* 241 F.3d 1299, 1304 (10th Cir.2001); *Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.,* 157 F.3d 775, 779 (10th Cir.1998).

In analyzing the specific language at issue in *Cogswell*, the court determined that the NASD Code provision at issue, stating that "[n]o dispute, claim or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim, or controversy," *see* NASD Code § 10304, " 'can reasonably be read in only

one way--as a substantive limit on the claims that the parties have contracted to submit to arbitration.' " *See Cogswell,* 78 F.3d at 479 (quoting *PaineWebber, Inc. v. Hofmann,* 984 F.2d 1372, 1379 (3d. Cir. 1993)). We thus concluded that a reading of NASD Code § 10304 simply could not provide the type of "clear and convincing" evidence that is required to allow arbitrators to decide the arbitrability of the parties' dispute.[4] *See id.* at 480-81. Based upon this finding, we concluded in *Cogswell* that "[§ 10304] of the NASD Code defines the arbitrators' substantive jurisdiction and [thus] that the courts, not the arbitrators themselves, must decide whether a claim is time-barred under that provision." *Id.* at 481.

2) *New York State law does not govern the arbitrability issue*

Howsam argues that this court's decision in *Cogswell* is not controlling because the 1992 ACCESS Agreement contains a provision specifying that New York state law governs any dispute between the parties, "without reference to choice of law doctrine." Howsam notes that, after the *Cogswell* decision was handed down on February 23, 1996, the New York Court of Appeals decided *Smith Barney Shearson, Inc. v. Sacharow,* 91 N.Y.2d 39, 666 N.Y.S.2d 990, 689 N.E.2d 884 (1997), in which it found that an arbitration agreement, which was substantially similar to the agreements at issue in this case, provided "clear and unmistakable" evidence that the parties intended to have the issue of arbitrability under NASD Code § 10304 decided by an arbitrator rather than the courts.[5]

---

**4.** We also concluded that NASD Code § 10324 (formerly NASD Code § 35), which states that "arbitrators shall be empowered to interpret and determine the applicability of all provisions under [the NASD Code]," *see* NASD Code § 10324, did not provide "clear and

unmistakable" evidence that the question of arbitrability should be decided by arbitrators rather than the courts. *See Cogswell,* 78 F.3d at 480-81.

**5.** In *Sacharow,* New York's highest court reviewed an arbitration agreement which stated

■ Howsam is incorrect that the choice of law provision in the parties' 1992 ACCESS Agreement mandates that we follow New York state law rather our own precedent. The Federal Arbitration Act, 9 U.S.C. §§ 1-16, which applies to all arbitration agreements "involving commerce," 9 U.S.C. § 2, "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). "Federal law in the terms of the Arbitration Act governs that issue in either state or federal court." *Id.* As the First Circuit Court of Appeals stated in *PaineWebber, Inc. v. Elahi*, 87 F.3d 589 (1st Cir.1996):

Section 2 of the Federal Arbitration Act ("FAA"), "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Although "[t]he FAA contains no express pre-emptive provision," and "[does not] reflect a congressional intent to occupy the entire field of arbitration," *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 477, 109 S.Ct. 1248, 103

L.Ed.2d 488 (1989), it was intended to "create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone*, 460 U.S. at 24, 103 S.Ct. 927.

87 F.3d at 593 (parallel citations omitted).

The *Elahi* court was faced with a choice of law provision in the arbitration agreement which, as in the case before us, provided that "this agreement and its enforcement shall be construed and governed by the laws of the State of New York." *See* 87 F.3d at 591. Despite this contractual language, the *Elahi* court held that the parties' choice of law provision did not control the issue of arbitrability. The court, quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63-64, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), held:

"We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration...."

*Elahi*, 87 F.3d at 594. Thus, the federal substantive law of arbitrability, rather

that " '[a]ny controversy ... shall be settled by arbitration' in accordance with the rules of the NASD Code," and which provided that all disputes would be governed by New York law. *See* 666 N.Y.S.2d 990, 689 N.E.2d at 885. The *Sacharow* court acknowledged that arbitrability is ordinarily a question for the courts under New York law, but noted that "an ... exception has evolved which recognizes, respects and enforces a commitment by the parties, nevertheless, to arbitrate even that issue when they 'clearly and unmistakably [so] provide.' " *Id.* at 887 (quoting *AT & T*, 475 U.S. at 649, 106 S.Ct. 1415). Relying upon the Second Circuit's opinion in *Paine-*

*Webber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996), the New York Court of Appeals held that the words "any and all controversies" were expansive enough to " 'encompass disputes over whether a claim is timely and whether a claim is within the scope of arbitration.' " *Sacharow*, 666 N.Y.S.2d 990, 689 N.E.2d at 887 (quoting *Bybyk*, 81 F.3d at 1199). The court further noted that "the appropriate remedy for the party alleging a violation of [§ 10304] of the NASD Code 'is to defend the arbitration action on timeliness grounds, not to enjoin arbitration altogether.' " *Id.* (quoting *Bybyk*, 81 F.3d at 1200).

than state law, must be applied when deciding whether the arbitration at issue was time-barred under the NASD Code.[6] *See id.* at 593 ("[T]he question whether a court or an arbitrator applies the [NASD § 10304] time bar relates closely to 'arbitrability,' so we must apply the federal common law of arbitrability that has developed pursuant to the FAA."); *cf. UHC Mgmt. Co. v. Computer Sci. Corp.,* 148 F.3d 992, 996 (8th Cir.1998) ("A number of post-*Mastrobuono* cases have interpreted that decision as similarly rejecting the notion that a general state choice-of-law clause appended to a contract that also includes an arbitration provision will preempt the applicability of the FAA in a federal court proceeding." (citing *Ferro Corp. v. Garrison Indus., Inc.,* 142 F.3d 926, 936-38 (6th Cir.1998)); *Gallus Inv., L.P. v. Pudgie's Famous Chicken, Ltd.,* 134 F.3d 231, 233 (4th Cir.1998); *National Union Fire Ins. Co. v. Belco Petroleum Corp.,* 88 F.3d 129, 134-35 (2d Cir.1996); *Elahi,* 87 F.3d at 594 & n. 5; *Atlantic Aviation, Inc. v. EBM Group, Inc.,* 11 F.3d 1276, 1280 (5th Cir.1994)).

We have no doubt that the arbitration agreement in this case, which was intended to cover "all controversies" related to Dean Witter's provision of investment services to Howsam, "involve[d] commerce" as broadly defined by the Supreme Court in *Allied–Bruce Terminix Co. v. Dobson,* 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (concluding that the "word 'involving,' like 'affecting,' signals an intent to exercise Congress' commerce power to the full"). *See Elahi,* 87 F.3d at 593; *Merrill Lynch, Pierce, Fenner & Smith v. Masland,* 878 F.Supp. 710, 712 (M.D.Pa.1995) (finding arbitration agreement stemming from the parties' investment services relationship to fall within the purview of the FAA notwithstanding a choice of law provision in the contract selecting New York law); *Dean Witter Reynolds, Inc. v. Daily,* 12 F. Supp. 2d 1319, 1322 (S.D.Fla.1998) (same). Accordingly, we hold that the 1992 ACCESS Agreement, as supplemented by the 1997 Submission Agreement, is subject to the federal substantive law of arbitrability despite the choice of law provision contained in the 1992 ACCESS Agreement. *See Elahi,* 87 F.3d at 593; *Masland,* 878 F.Supp. at 712 ("[The FAA] creates a body of federal substantive law of arbitrability.... [T]o the extent that the contract purports to establish New York law as controlling the issue of arbitrability, the contract language is preempted by [the FAA]."); *Daily,* 12 F. Supp. 2d at 1322 ("There is no dispute that the Account Agreement is within the scope of the FAA because it is one clearly 'involving commerce.' Thus the Court finds that the Account Agreement is subject to federal arbitration law rather than New York law." (citation omitted)). On the arbitrability issue before us, then, we are not governed by how the New York Court of Appeals construed similar arbitrability language, but are governed instead by the federal law of arbitrability, as that law has been established in the Tenth Circuit by *Cogswell.*[7]

---

**6.** Indeed, the New York Court of Appeals in *Sacharow* reached the same conclusion regarding the effect of the FAA. *See* 666 N.Y.S.2d 990, 689 N.E.2d at 889.

**7.** Were we to address the merits of *Sacharow* 's analysis as to whether the parties had "clearly and unmistakably" agreed to submit the issue of arbitrability to the arbitrators rather than the courts, we would respectfully disagree with the *Sacharow* holding. We believe the *Sacharow* court gave insubstantial weight to the presumption established in *First Options* that parties to arbitration agreements generally intend arbitrability questions to be resolved by the courts.

3) *Under this court's Cogswell decision, the parties' agreement does not provide "clear and unmistakable" evidence of the parties' intent to have the arbitrability issue resolved by an arbitrator rather than the courts.*

Of course, the most "clear and unmistakable" agreement to arbitrate the issue of arbitrability would be an express statement to that effect in the parties' contractual agreement to arbitrate disputes arising between them. Indeed, the Supreme Court has stated that "silence or ambiguity about the question 'who (primarily) should decide arbitrability,' " *First Options,* 514 U.S. at 944, should not be viewed as giving the arbitrators that power, "for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide," *id.* at 945. Given the Supreme Court's stated disregard for "silence or ambiguity" in the contractual language, it seems entirely possible that an express statement in the contract is not only preferable, but necessary, to a finding that the parties "clearly and unmistakably" agreed to submit arbitrability questions to an arbitrator rather than the courts. We need not resolve that issue, however, because the language contained in the 1992 ACCESS Agreement and 1997 Submission Agreement falls squarely within this court's previous holding in *Cogswell* and thus cannot, under *Cogswell,* provide "clear and unmistakable" evidence of the parties' intent.[8]

The *Cogswell* court focused on the language of relevant provisions in the NASD Code when it determined that the parties' agreement did not provide "clear and unmistakable" evidence of the parties intent regarding the arbitrability issue. The NASD Code language addressed by the *Cogswell* court is identical to the NASD Code language adopted in the 1997 Submission Agreement, such that *Cogswell* governs our interpretation of that language. In addition, even if we go beyond the NASD Code sections analyzed by the *Cogswell* court, the language contained in the underlying arbitration agreements at issue in *Cogswell* is materially indistinguishable from the language of the 1992 ACCESS Agreement and 1997 Submission Agreement at issue in this case.

In *Cogswell,* the original arbitration agreement stated that the parties "agree[d] that any controversy arising out of [the client's] business or this Agreement shall be submitted to arbitration conducted according to the rules and procedures of the New York Stock Exchange, Inc. ('NYSE') or of the National Association of Securities Dealers, Inc. ('NASD') as [the client] may elect." *See Cogswell,* 78 F.3d at 475. Here, as noted above, the 1992 ACCESS Agreement stated:

> The Client agrees that all controversies between the Client and Dean Witter and/or any of its officers, directors, or employees, present or former, concerning or arising from (i) any account main-

---

**8.** We note that there is some confusion in the case law as to *which* language should be relied upon to decide whether the parties have "clearly and unmistakably" decided to arbitrate the issue of arbitrability. While some courts look to the language of the parties' contract, *see, e.g., Dean Witter Reynolds, Inc. v. Daily,* 12 F. Supp. 2d 1319, 1322 (S.D.Fla. 1998) (analyzing agreement regarding "all controversies ... arising out of or concerning any such account, [or] any transactions ..."), other courts look only at the relevant provi-

sions in the NASD Code, *see, e.g., Cogswell,* 78 F.3d at 481; *Edward D. Jones & Co. v. Sorrells,* 957 F.2d 509, 512 (7th Cir.1992) (analyzing the parties' intent by looking to the NASD Code). Regardless of which language this court considers in the instant case, however, *Cogswell* mandates a finding that arbitrability must here be determined by the court because the agreements between Howsam and Dean Witter did not "clearly and unmistakably" provide that the question of arbitrability should be resolved by an arbitrator.

tained with Dean Witter by Client; (ii) any transaction involving Dean Witter and Client, whether or not such transaction occurred in such account or accounts; or (iii) the construction, performance or breach of this or any other agreement between us, whether such controversy arose prior to, on or subsequent to the date hereof, shall be determined by arbitration. . . .

We find no material difference between the contractual language at issue in *Cogswell* and the relevant contractual language contained in the 1992 ACCESS Agreement.

Similarly, the uniform submission agreement signed by the *Cogswell* plaintiff when initiating the arbitration proceeding stated that the proceeding would be governed by the "Constitution, By-Laws, Rules, Regulations and/or Code of Arbitration . . . of the [NASD]." *See id.* Here, the 1997 Submission Agreement stated: "The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, . . . to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization." Again, there is no material difference between the submission agreement at issue in *Cogswell* and the 1997 Submission Agreement at issue in the present case.

The only potentially material difference between the contractual language in *Cogswell* and the language at issue here is that the parties in this case also agreed in the 1992 ACCESS Agreement to "waiv[e] their right to seek remedies in court, including the right to a jury trial." This language played a substantial part in the district court's opinion below. *See Dean Witter Reynolds, Inc. v. Howsam,* No. 97-WM-1463, slip op. at 3-4 (D. Colo. June 28, 1999). We do not find it availing, however. At most, this language is ambiguous and

therefore does not satisfy the *First Options* requirement of a "clear and unmistakable" intent by the parties to have the NASD § 10304 arbitrability issue decided by an arbitrator rather than a court. The language does not refer specifically to arbitrability, and it is unlikely that it was intended to state that Howsam could not in any circumstance resort to the courts. Such a literal reading of the provision would mean that Howsam had waived any ability to seek an order compelling arbitration, *see* 9 U.S.C. §§ 3, 4, or to seek judicial enforcement of an arbitration award, *see id.* § 9, or even to seek vacatur of the arbitrator's award if the arbitrator exceeded his or her powers, *see id.* at § 10. Such a reading would essentially nullify Howsam's arbitration rights entirely, and yet if Howsam did not intend by this clause to waive all her rights to seek judicial assistance with the arbitration process, she can hardly argue that the clause "clearly and unmistakably" waives both parties' right to seek a judicial determination of arbitrability. The reference to a "jury trial," in particular, is peculiar, although it is perhaps a reference to the jury trial rights found in Section 4 of the FAA, *see* 9 U.S.C. § 4. Regardless of its exact meaning, the "jury trial" reference suggests a narrow scope to the clause, perhaps suggesting that issues that are arbitrable should be determined according to the remedies available in arbitration without resort to additional judicial remedies. Whatever it means, however, this clause is simply not a clear and unambiguous statement that courts should not be involved in the threshold arbitrability question at issue in this case.

We recognize that the circuit courts of appeals are almost evenly divided on the issue of whether the limitations period set forth in NASD Code § 10304 is a substantive eligibility requirement, or jurisdictional prerequisite to arbitration, which must be determined in the first instance by the

courts. The Third, Sixth, Seventh, Tenth and Eleventh Circuits have all answered that question in the affirmative, while the First, Second, Fifth, Eighth and Ninth Circuits have all answered that question in the negative. *See Elahi,* 87 F.3d at 596-99 (collecting and discussing cases from other circuits). Ultimately, questions of arbitrability and who decides whether a particular claim is arbitrable are matters of the parties' intent. It therefore seems to this court that amendment by the NASD and other arbitration forums of their rules and submission agreements to "clearly and unmistakably" resolve this issue one way or another is long overdue.[9] Until the arbitration organizations undertake such action, however, we are bound by the presumptions established in *First Options* and our own Tenth Circuit precedent in *Cogswell.*

## CONCLUSION

For the foregoing reasons, we RE-VERSE the decision of the district court and REMAND for further proceedings not inconsistent with this opinion.

---

9. We note that the NASD has proposed at least two amendments to § 10304 in the last seven years that would have resolved the "who decides arbitrability" question conclusively in favor of the NASD deciding whether a particular claim is time-barred under § 10304. *See* Self Regulatory Organizations, Notice of Filing of Amended Proposed Rule Change by National Association of Securities Dealers, Inc. Relating to the Eligibility of Disputes for Arbitration, 59 Fed. Reg. 39,373, at 39,373-74 (proposed July 26, 1994) (stating "the Director of Arbitration shall determine if the claim is eligible for submission to arbitration by determining if the claim alleges that less than six (6) years have elapsed between the occurrence or event giving rise to the dispute, claim or controversy and filing of the claim.") (withdrawn from SEC consideration in October 1994, *see Elahi,* 87 F.3d at 596 n. 9); Self Regulatory Organizations, Notice of Filing of Proposed Rule Change by the National Association of Securities Dealers, Inc. Relating to the Eligibility of Claims for Arbitration, 63 Fed. Reg. 588, at 589 (proposed Jan. 6, 1998) (stating that the Director of Arbitration, if asked by one of the parties to decide eligibility under § 10304, will determine eligibility and that his decision is final and binding upon the parties) (not adopted as of January 2000, *see J.E. Liss & Co. v. Levin,* 201 F.3d 848, 851 (7th Cir.2000)). It appears, however, either that the NASD has withdrawn, or that the Securities and Exchange Commission has refused to approve, the amendments to § 10304 proposed by the NASD over the last several years.